**FEDERAL TRADE COMMISSION,**
**Plaintiff-Appellant,**

v.

**WARNER COMMUNICATIONS INC., et al., Defendants-Appellees.**

**No. 84–5809.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 2, 1984.

Decided Sept. 13, 1984.

---

David C. Shonka, F.T.C., Washington, D.C., George S. Cary, F.T.C., Los Angeles, Cal., Howard E. Shapiro, Washington, D.C., for plaintiff-appellant.

Alan B. Pick, Los Angeles, Cal., William E. Willis, New York City, Allyn O. Kreps, Jones, Day, Reavis & Pogue, Los Angeles, Cal., Stuart Robinowitz, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants-appellees.

Before GOODWIN, FARRIS and POOLE, Circuit Judges.

PER CURIAM:

The Federal Trade Commission appeals from the district court order denying the Commission's application for a preliminary injunction to block a proposed joint venture involving Warner Communications Inc. and Polygram Records, Inc. We reverse.

## FACTS

Warner Communications Inc. is a diversified communications company that operates three record labels (Warner, Atlantic and Elektra/Asylum) and distributes prerecorded music in the United States and abroad. In 1983, Warner was the second largest distributor of prerecorded music in the United States. Polygram Records, Inc., owned by N.V. Philips and Siemens AG, operates classical and popular record labels and distributes prerecorded music here and abroad. In 1983, Polygram was the sixth largest distributor of prerecorded music in the United States. Warner and Polygram plan to merge part of their record operations and form a joint venture company. Under the terms of the proposed joint venture, Polygram would close its distribution operations in the United States and the joint venture company would distribute Polygram's records.

The Federal Trade Commission brought an action seeking a preliminary injunction under section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), to block the proposed merger until the completion of administrative proceedings. The Commission alleged that the proposed joint venture would violate section 7 of the Clayton Act (15 U.S.C. § 18) and section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).

During discovery, the defendants requested that the Commission produce two memoranda prepared by members of the Commission's Bureau of Economics. The memoranda, prepared before the Commission filed the action for preliminary relief, recommended that the Commission not challenge the merger. The district court ordered the Commission to produce the memoranda.

On April 10, 1984, the district court denied the Commission's motion for a preliminary injunction. On April 12, 1984, the Commission filed an Emergency Motion for Injunction Pending Appeal, which we granted.

We now reverse the district court decision because the district court applied an incorrect legal standard and improperly relied on the Bureau of Economics memoranda. Applying the correct legal standard, we hold that preliminary injunctive relief is warranted.

## DISCUSSION

■ Section 13(b) of the Federal Trade Commission Act provides that "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest ... a preliminary injunction may be granted...." 15 U.S.C. § 53(b). Section 13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction. *See* Conference Report

No. 624, 93d Cong., 1st Sess. 11, *reprinted in* 1973 U.S.Code Cong. & Admin.News 2417, 2533; *Federal Trade Commission v. Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C.Cir.1981).

■ In determining whether to grant a preliminary injunction under section 13(b), a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities. *Federal Trade Commission v. Simeon Management Corp.*, 532 F.2d 708, 713–14 (9th Cir.1976). The denial of a motion for preliminary injunction will be reversed only if the district court abused its discretion or based its decision on an erroneous legal premise. *American Motorcyclist Association v. Watt*, 714 F.2d 962, 965 (9th Cir.1983); *Simeon Management Corp.*, 532 F.2d at 711.

## I. THE DISTRICT COURT DECISION

### A. Correct Legal Standard Under Section 7

The Commission argues that the district court order denying preliminary injunctive relief should be reversed because the court applied an incorrect legal standard. In its order, the district court said that the recorded music market does not operate in a manner conducive to "collusion," that "collusion" was unlikely at the record label level and that "collusion" regarding prices, critical non-price elements and new releases was impossible. The court mentioned "collusion" in seven of its 18 conclusions of law.

"Collusion" is "[a] secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purpose." Black's Law Dictionary 240 (5th Ed.1979). It implies the existence of fraud, the employment of fraudulent means, or the employment of lawful means to accomplish an unlawful purpose. *Id.*

It appears that the district court was applying section 1 of the Sherman Act when it required a showing of collusion. Section 1 prohibits every unreasonable "contract, combination ... or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. It is unlawful, for example, for businesses that compete in the same market to collude by entering into agreements which divide up the market. *See Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 899–900 (9th Cir.1983); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1354 (9th Cir. 1982).

■ Section 7 of the Clayton Act requires far less than a showing of collusion. Section 7 prohibits mergers whose effect *"may be* substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). It was intended to arrest the anticipated anticompetitive effects of acquisitions and other intercorporate transactions in their incipiency. *See United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589, 597, 77 S.Ct. 872, 875, 879, 1 L.Ed.2d 1057 (1957); *Ash Grove Cement Co. v. Federal Trade Commission*, 577 F.2d 1368, 1378 (9th Cir.), *cert. denied*, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978); *United States v. Coca-Cola Bottling Co.*, 575 F.2d 222, 231 (9th Cir.), *cert. denied*, 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978). The "core question [in a Section 7 case] is whether a merger may substantially lessen competition...." *Federal Trade Commission v. Procter & Gamble Co.*, 386 U.S. 568, 577, 87 S.Ct. 1224, 1229, 18 L.Ed.2d 303 (1967). It is well established that a section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect. *See, e.g., Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 274 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

■ Since Section 7 requires only a showing of reasonable probability of anticompetitive effect and the district court required a showing of collusion, we conclude that the court applied an incorrect legal standard.

### B. Bureau of Economics Memoranda

■ The Commission argues that the district court erred also in ordering production

of and in relying on the two memoranda prepared by members of the Bureau of Economics. The Commission contends that the memoranda were protected from disclosure under the government's "deliberative process privilege." This privilege permits the government to withhold documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). It was developed to promote frank and independent discussion among those responsible for making governmental decisions, *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973), and also to protect against premature disclosure of proposed agency policies or decisions. *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980). The ultimate purpose of the privilege is to protect the quality of agency decisions. *Sears*, 421 U.S. at 151, 95 S.Ct. at 1517.

■ A document must meet two requirements for the deliberative process privilege to apply. First, the document must be predecisional—it must have been generated before the adoption of an agency's policy or decision. *Coastal States*, 617 F.2d at 866. The Bureau of Economics memoranda satisfy this requirement. The authors investigated the proposed joint venture and drafted the memoranda before the Commission made the decision to challenge the venture. *See White v. IRS*, 707 F.2d 897, 902 (6th Cir.1983). Second, the document must be deliberative in nature, containing opinions, recommendations, or advice about agency policies. *Coastal States*, 617 F.2d at 866. Purely factual material that does not reflect deliberative processes is not protected. *Mink*, 410 U.S. at 87–89, 93 S.Ct. at 836–837. The Bureau of Economics memoranda contain analyses of the record industry and the merger's potential effects on competition, and recommendations on whether the Commission should challenge the venture. Analyses and recommendations play a critical role in

the Commission's decision whether or not to challenge a merger. The memoranda go to the heart of the deliberative and policy-making processes. Moreover, the factual material in the memoranda is so interwoven with the deliberative material that it is not severable. *See Binion v. Department of Justice*, 695 F.2d 1189, 1193 (9th Cir. 1983). The deliberative process privilege applies to the two memoranda.

■ The deliberative process privilege is a qualified one. A litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure. *See United States v. Leggett & Platt, Inc.*, 542 F.2d 655, 658 (6th Cir.1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *United States v. American Telephone and Telegraph Co.*, 524 F.Supp. 1381, 1386 n. 14 (D.D.C.1981). Among the factors to be considered in making this determination are: 1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions. *See, e.g., Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 327–329 (D.D.C.1966), *aff'd*, 384 F.2d 979 (D.C.Cir.), *cert. denied*, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *In re Franklin National Bank Securities Litigation*, 478 F.Supp. 577, 583 (E.D.N.Y. 1979); 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 509[07] at 46–47 (1982).

In the present case, the Bureau of Economics memoranda are relevant; they contain material regarding various aspects of market structure and the merger's effect on competition. However, information regarding market structure and competitive effects was available to the defendants. The defendants presented extensive evidence on relevant market, market structure, barriers to entry and effects on competition. Because the defendants were able to obtain and introduce evidence on

these issues, they had little need for the memoranda.

The parties characterize differently the government's role in this litigation. Although the memoranda take positions which conflict with the Commission's litigation position, the defendants have presented no evidence of bad faith or misconduct on the part of the Commission. The fact that the Commission has in the past disclosed reports supporting its litigation position does not show bad faith in this case, nor does the fact that, prior to its decision to sue, the Commission disclosed the conclusions reached in one of the memoranda. Only the conclusions were disclosed; the analysis was kept secret.

Finally, compelled disclosure of the memoranda almost certainly injures the quality of agency decisions. It chills frank discussion and deliberation in the future among those responsible for making governmental decisions. It also encourages the Commission to have deliberative reports and recommendations prepared only by those economists who will draw the conclusions sought by the Commission.

■ Since the defendants were able to obtain and present evidence on the merger's effects on competition, there was no bad faith or misconduct on the part of the Commission, and compelled disclosure would likely hinder effective agency decision making, we conclude that the district court abused its discretion in ordering the production of the memoranda.

The record reflects that the district court relied on the memoranda and that this improper reliance materially affected its decision to deny injunctive relief. In its order, the court said that the affidavits, declarations, other exhibits "and, in particular," the two Bureau of Economics memoranda established that the Commission was unlikely to succeed on the merits of the claim. The error was not harmless.

## II. WHETHER TO GRANT PRELIMINARY RELIEF

The decision whether to grant preliminary relief turns on a determination of the likelihood of the Commission's success on the merits and on a balance of the equities. *Simeon Management Corp.,* 532 F.2d at 714. We do not accord the usual deference to the district court's findings regarding relevant market, market concentration and barriers to entry because these findings were improperly based on the Bureau of Economics memoranda.

### A. Likelihood of Success

■ The issue is whether the Commission has demonstrated a likelihood of ultimate success. The Commission meets its burden if it "raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Federal Trade Commission v. National Tea Co.,* 603 F.2d 694, 698 (8th Cir.1979); *Federal Trade Commission v. Beatrice Foods Co.,* 587 F.2d 1225, 1229 (D.C.Cir.1978) (statement of Judges MacKinnon and Robb); *Federal Trade Commission v. Rhinechem Corp.,* 459 F.Supp. 785, 789 (N.D.Ill.1978); *Federal Trade Commission v. Lancaster Colony Corp.,* 434 F.Supp. 1088, 1091 (S.D.N.Y.1977); *but see Federal Trade Commission v. Atlantic Richfield Co.,* 549 F.2d 289, 291 (4th Cir.1977) (court imposes more rigorous burden).

■ The parties have presented conflicting evidence on the relevant product market, market concentration, market shares, barriers to entry and the merger's probable effect on competition. Our present task is not to make a final determination on whether the proposed merger violates Section 7, but rather to make only a preliminary assessment of the merger's impact on competition. *See Federal Trade Commission v. Food Town Stores Inc.,* 539 F.2d 1339, 1344 (4th Cir.1976). Factors to consider when determining the impact on competition include the market shares of the merging firms, industry trends towards concentration, the degree of concentration

within the industry, prior mergers by the firms in question and the barriers to entry in the industry. *Marathon Oil Co. v. Mobil Corp.*, 530 F.Supp. 315, 325 (N.D.Ohio), *aff'd*, 669 F.2d 378 (6th Cir.1981), *adhered to*, 669 F.2d 384 (6th Cir.), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982). This list of factors is not exhaustive.

■ The relevant product market is determined by examining the reasonable interchangeability of use between the product and substitutes for it. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). The boundaries of the market may be determined by considering such factors as industry or public recognition of the market, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *Id.; Equifax, Inc. v. Federal Trade Commission*, 618 F.2d 63, 66 (9th Cir.1980).

The Commission argues that the relevant market is prerecorded music, which includes all recorded sound performances sold to consumers in the form of singles, long playing albums, cassettes, tapes, eight track cartridges and compact disks. The defendants contend that the relevant market is recorded music, which includes "home tapes" of prerecorded music. The determination of relevant market is critical because the respective markets have significantly different structures.

The Commission offered record company documents and affidavits from company officials that indicate that the record industry recognizes prerecorded music as a market separate from the recorded music market. Although there is no direct evidence that consumers regard the prerecorded music market as a separate market, prerecorded music has distinct characteristics. Prerecorded music, unlike home tapes, is a ready-to-play product, sold in an attractive package which often includes artwork and liner notes. These characteristics suggest that prerecorded music and home tapes are not interchangeable. Also, there is a price difference of approximately 300 percent between home tapes and prerecorded music, and the Commission presented evidence that an increase in the price of prerecorded music would not cause a massive shift to home taping.

The Commission also presented evidence that 1) the prerecorded music industry is moderately concentrated at the distributor level and 2) the top four record distributors command approximately 67 percent of the domestic market. Warner, the company with the second highest share, distributes 18.9 percent of the prerecorded music products and Polygram, with the sixth highest share, distributes 7.1 percent. If the proposed joint venture is completed, the market share of the combined firm would be approximately 26 percent and the market share of the top four firms would be approximately 75 percent.[1]

The parties agree that there has been a trend toward increased concentration among record distributors. The record reflects that many companies have recently terminated their distribution operations. Many other record companies have attempted to enter the distribution market but have failed.

The Commission presented evidence showing the difficulty of entering the distribution market due to high capital costs, lack of expertise, inability to attract top performers, disadvantages in obtaining radio air play and point of sale promotion, and inability to demand and receive payment from retailers on an equal basis with established distributors. Moreover, the Commission presented evidence that sub-distributors and video distributors could not become national prerecorded music distributors because of the special expertise and facilities required. Finally, affidavits

---

1. We recognize that statistics concerning market share and concentration are not conclusive indicators of anticompetitive effects, but they provide a meaningful context within which to address the question of the merger's competitive effects. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974).

from record company executives suggest that at least $125,000,000 in sales at wholesale is required to maintain a national record distribution operation. There is an insufficient supply of independently produced prerecorded music to allow a new entrant to obtain and sustain this volume.

■ The Commission has made a tenable showing that the relevant market is prerecorded music, that this market is moderately concentrated, that there is a trend toward increased concentration, that the proposed joint venture would accelerate this trend and that there are substantial barriers to entry. The government has met its burden of demonstrating a likelihood of success by presenting evidence sufficient to raise "serious, substantial, difficult" questions regarding the anticompetitive effects of the proposed joint venture. *See National Tea,* 603 F.2d at 698; *Rhinechem Corp.,* 459 F.Supp. at 789; *Lancaster Colony Corp.,* 434 F.Supp. at 1091.

In so holding, we do not ignore the evidence presented by the defendants which conflicts with the Commission's evidence. Because the issue in this action for preliminary relief is a narrow one, we do not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues. *See Lancaster Colony Corp.,* 434 F.Supp. at 1094, 1096. We hold only that the Commission has met its burden of showing a likelihood of success on the merits.

■ The defendants attempt to justify the proposed merger by arguing that the merger would not be the cause for the reduction in the number of distributors and any resulting anticompetitive effects, because Polygram intends to leave the distribution market due to economic necessity. (The parties agree that Polygram is not asserting a "failing company" defense.) *See International Shoe Co. v. Federal Trade Commission,* 280 U.S. 291, 302, 50 S.Ct. 89, 93, 74 L.Ed. 431 (1930); *Brown Shoe,* 370 U.S. at 346, 82 S.Ct. at 1535. We reject the argument. In *United States v. Phillips Petroleum Co.,* 367 F.Supp. 1226

(C.D.Cal.1973), *aff'd mem.,* 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974), the court rejected a similar argument that an acquisition would not violate section 7 where the acquired company intended to go out of business. It said:

> Section 7 is concerned only with the effect upon competition of an acquisition, and the statutory language was carefully drafted to refer only to an acquisition's effect. If the acquisition has a substantial anticompetitive effect, it is illegal under § 7.... The issue in an antitrust case is not a determination of the reasons for selling, but only the anticompetitive effect of the sale.

*Id.* at 1258–59.

The defendants cite several cases in which courts have upheld mergers and affirmed the denial of preliminary injunctions where a financially troubled company or a weak competitor has been acquired by a strong competitor. *See, e.g., Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Federal Trade Commission v. National Tea Co.,* 603 F.2d 694 (8th Cir.1979); *United States v. International Harvester Co.,* 564 F.2d 769 (7th Cir.1977). Such decisions have been criticized by courts and commentators. *See, e.g., Kaiser Aluminum & Chemical Corp. v. Federal Trade Commission,* 652 F.2d 1324, 1338–40 (7th Cir. 1981); 4 P. Areeda & D. Turner, Antitrust Law ¶ 935 b, c (1980). In *Kaiser, supra,* the court said that "[f]inancial weakness, while perhaps relevant in some cases, is probably the weakest ground of all for justifying a merger." 652 F.2d at 1339. The acquisition of a financially weak company hands over the company's customers to the acquiring company, thereby deterring competition by preventing others from securing those customers. *Id.* Also, a "weak company" defense would expand the failing company doctrine, a defense which has strict limits. *Id.*

*Phillips Petroleum* and *Kaiser* provide persuasive reasons for rejecting or attaching little weight to a defense of financial

plight as a ground for justifying a merger. However, we need not resolve the question of how much weight, if any, should be given to the weak financial condition of a company in a section 7 case. We hold only that a company's stated intention to leave the market or its financial weakness does not in itself justify a merger.

### B. Balance of Equities

■■■■ The second step in deciding whether to grant a preliminary injunction is to balance the equities. *Simeon Management Corp.*, 532 F.2d at 714. Although private equities may be considered, public equities receive far greater weight. *Federal Trade Commission v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C.Cir.1981); *Federal Trade Commission v. National Tea Co.*, 603 F.2d 694, 697 & n. 4 (8th Cir.1979); *but see Federal Trade Commission v. Food Town Stores, Inc.*, 539 F.2d 1339, 1344, 1346 (4th Cir.1976) (private equities not to be considered). When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction. *Weyerhaeuser*, 665 F.2d at 1083.

Public equities may include "beneficial economic effects and pro-competitive advantages for consumers." *Federal Trade Commission v. Pharmtech Research, Inc.*, 576 F.Supp. 294, 299 (D.D.C.1983). In the present case, because the record contains conflicting evidence on the anticompetitive effects of the merger, it is unclear whether these equities support the grant or denial of injunctive relief.

■■■ A different public equity, however, supports the grant of injunctive relief. A denial of a preliminary injunction would preclude effective relief if the Commission ultimately prevails and divestiture is ordered. *See Federal Trade Commission v. Great Lakes Chemical Corp.*, 528 F.Supp. 84, 87 (N.D.Ill.1981). Since the proposed joint venture calls for Polygram to dismantle its distribution operations, it would be exceedingly difficult for Polygram to revive the operations to comply with a dives-

titure order. The defendants argue that effective relief would still be possible because the Commission could compel Polygram to make alternate distribution arrangements upon withdrawing from the joint venture. In light of the high concentration in the distribution market, however, it may not be possible to make an arrangement which is permissible under section 7.

With respect to private equities, the defendants argue that a preliminary injunction would force them to abandon the joint venture. The defendants would not be able to operate effectively due to the uncertainties resulting from the pendency of the proposed transaction. Polygram asserts that its efforts to sign artists have been hindered and that many employees have left the company because of the uncertainty. The defendants also argue that there are private equities in allowing Polygram to escape its troubled financial condition by merging with Warner, *see United States v. G. Heileman Brewing Co.*, 345 F.Supp. 117, 122–24 (E.D.Mich.1972), and in allowing Polygram's shareholders to reap the benefits of the merger. *See Great Lakes Chemical*, 528 F.Supp. at 98.

Although these asserted private injuries are entitled to serious consideration, private equities alone do not outweigh the Commission's showing of likelihood of success. *Weyerhaeuser*, 665 F.2d at 1082–83. Since the Commission has demonstrated a likelihood of success and the public equities do not support the denial of injunctive relief, a preliminary injunction is warranted.

### CONCLUSION

We reverse the district court's denial of the Commission's application for a preliminary injunction. The preliminary injunction shall remain in effect until the completion of the administrative proceedings. Because undue delay could force the parties to abandon the proposed merger, the Commission is ordered to expedite proceedings. We shall retain jurisdiction to ensure compliance with this order.

IT IS SO ORDERED.

1166–1172